**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | **CRIMINAL CASE NO. 3:10CR00016-1** |
| | **)** | |
| **v.** | **)** | **MEMORANDUM OPINION** |
| | **)** | |
| **DANIEL J. BROWN** | **)** | **BY: NORMAN K. MOON** |
| | **)** | **UNITED STATES DISTRICT JUDGE** |

Defendant Daniel J. Brown has filed a motion seeking to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. Defendant's motion argues that the attorney who represented him at trial was ineffective for not moving to suppress evidence on the ground that there had been an unreasonable lapse of 78 days between the warrantless seizure of Defendant's laptop computer and external hard drive and the eventual date when law enforcement applied for a search warrant and proceeded to examine the seized electronic equipment.[1]

Counsel was appointed to represent Defendant, the Government filed a motion for summary judgment,[2] and the parties' arguments have been fully briefed. Upon consideration of the record and

---

[1] The United States Court of Appeals for the Fourth Circuit held that exigent circumstances justified the warrantless seizure. *See U.S. v. Brown*, 701 F.3d 120, 127 (4th Cir. 2012). When interviewed at the time of the seizure, Defendant admitted to having used his computer to search for and download child pornography, and the eventual search of the laptop and external hard drive disclosed evidence of Defendant's knowing receipt and possession of child pornography. *Id.* at 123.

[2] The Government's motion (docket no. 149) is entered on the docket as a motion to dismiss. However, the motion asks "this Court to deny Petitioner's motion and to enter *summary judgment* on behalf of the United States." (Emphasis added.) Moreover, the motion relies on evidence outside the record, which I will consider. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *see also* Rule 12, Rules Governing Section 2255 Proceedings ("The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."). And, in support of his reply to the Government's motion, Defendant was granted leave to expand the record. *See* Rule 7, "Expanding the Record," Rules Governing Section 2255 Proceedings. Accordingly, the parties have been "given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also* Rule 7, Rules Governing Section 2255 Proceedings ("The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.").

the parties' filings, I will deny Defendant's motion, and I will grant the Government's motion.[3]

**I.**

On June 9, 2010, a grand jury returned a two-count indictment against Defendant. Count One charged Defendant with knowingly receiving child pornography or material that contained child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(b)(1). Count Two charged Defendant with possessing material that contained one or more images of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).

On June 29, 2010, Defendant made his initial appearance and arraignment. Andrea Harris, of the Office of the Federal Public Defender in Charlottesville, was appointed to represent him.

On July 16, 2010, a trial date was set for September 7, 2010. On August 24, 2010, I granted Defendant's motion to continue and rescheduled the trial to commence on November 22, 2010.

On November 1, 2010, Defendant filed a motion to substitute counsel, which I granted on the following day, substituting Vaughan C. Jones, Esq., for Ms. Harris. Soon thereafter, I granted a motion to continue filed by Mr. Jones, and the trial was rescheduled to commence on February 28, 2011.

On February 9, 2011, Defendant was charged in a two-count superseding indictment that, in part, expanded the time period of the offenses charged and added "attempt" language as contemplated by 18 U.S.C. § 2252(b). Count One charged Defendant with knowingly receiving and attempting to receive one or more visual depictions and the production of such visual depiction(s)

---

[3] The parties have not requested an evidentiary hearing, and I have determined, pursuant to Rule 8(a) of the Rules Governing Section 2255 Proceedings, that a hearing is not warranted.

involved the use of a minor engaging in sexually explicit conduct, and the visual depiction(s) were of such conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1). Count Two charged Defendant with possessing and attempting to possess at least one matter which contained a visual depiction and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).

Various motions (regarding conditions of release, evidentiary matters, and the like) were filed in January and February 2011. On Saturday, February 26, 2011, with trial scheduled to begin on Monday, February 28, 2011, Defendant's counsel filed a motion to suppress evidence from Defendant's computer. On Monday, February 28, 2011, prior to the commencement of trial, I heard brief argument regarding the motion, which I denied. I remarked on the late filing of the motion, but I denied it because of its lack of merit.

The trial began on Monday, February 28, 2011, and lasted through March 2, 2011. During the trial, Defendant objected, on the basis of his suppression arguments, to the entry of evidence obtained from his laptop. I overruled the objection. At the conclusion of the Government's evidence, Defendant renewed his motion to suppress, which I denied because there was "no merit to the argument." After the jury was given final instructions, Defendant again renewed his motion to suppress, which I again denied.

The jury returned guilty verdicts on both counts.

I held a sentencing hearing on June 1, 2011, but I continued the hearing because of disputed sentencing guideline enhancement issues (mainly the Government's belated push for a distribution enhancement).

On June 7, 2011, I received a letter from Defendant, which the Clerk of the Court docketed as a *pro se* motion seeking the appointment of new counsel and a new trial. I entered an order on June 8, 2011, denying the motion for a new trial, referring the matter of appointment of counsel to United States Magistrate Judge B. Waugh Crigler, and continuing sentencing pending the resolution of issues concerning Defendant's representation. At the conclusion of a hearing conducted on June 21, 2011, Judge Crigler discharged Defendant's retained counsel and appointed Defendant's present counsel, Frederick T. Heblich of the Office of the Federal Public Defender in Charlottesville. On June 22, 2011, the magistrate judge entered an order granting the motion and addressing matters attendant to the motion. That same day, Defendant filed a *pro se* motion requesting that I "simply overturn the juries [*sic*] verdict." By order entered on July 13, 2011, I denied the motion.

On September 21, 2011, Defendant filed a motion to dismiss Count One of the superseding indictment. On October 6, 2011, the Government filed a supplemental sentencing memorandum with its motion to dismiss Count Two of the superseding indictment. On October 7, 2011, Defendant replied to the Government's motion to dismiss and its supplemental sentencing memorandum.

On October 11, 2011, I held a sentencing hearing, during the course of which I granted the Government's motion to dismiss Count Two of the superseding indictment. I sentenced Defendant to serve a term of imprisonment of 144 months, followed by ten years of supervised release.

Defendant timely appealed to the United States Court of Appeals for the Fourth Circuit, arguing that I erred in denying the motion to suppress and that I abused my discretion when I dismissed Count Two of the superseding indictment, rather than Count One. In October 2012, the Fourth Circuit heard oral argument in the appeal and, on December 6, 2012, rejected each of

Defendant's contentions, affirming my judgments in the case. *See U.S. v. Brown*, 701 F.3d 120, 127 (4th Cir. 2012). As I have already noted, when interviewed at the time of the seizure, Defendant admitted to having used his computer to search for and download child pornography, and the eventual search of the laptop and external hard drive disclosed evidence of Defendant's knowing receipt and possession of child pornography. *Id.* at 123. Therefore, regarding the motion to suppress, the Court of Appeals held that exigent circumstances justified the warrantless seizure, finding that the detectives had probable cause to believe that Defendant's laptop "contained evidence of child pornography" and, "[f]ollowing up on Brown's response, it was entirely reasonable for the officers to seize Brown's laptop – as they did – to prevent either it or its contents from being damaged or destroyed." *Id.* at 127 (citations omitted).

The instant § 2255 motion followed.

## II.

### *A.*

The following facts are adduced from the evidence introduced at trial.

In May 2009, Detective Nicholas Rudman of the Charlottesville Police Department ("CPD"), a specialist in investigating Internet crimes against children, began an investigation into a particular Internet Protocol ("IP") address associated with multiple files of apparent child pornography on a peer-to-peer file sharing network. This IP address appeared as a download candidate at various dates and times. Detective Rudman continued his investigation and, by court order, learned that the subscriber of the IP address was Medical Transport, LLC, a private ambulance company in Charlottesville. Thereafter, Detective Rudman and another officer, Detective Todd Lucas, met with

a manager of Medical Transport, narrowed the focus of the investigation to one particular two-person crew (which included Defendant) at Medical Transport, applied for a search warrant, and chose to execute the search warrant on June 17, 2009, when that crew was working.

When Rudman and Lucas and two additional CPD officers arrived at Medical Transport to execute the warrant, Defendant's two-person crew was not on the premises. The detectives and officers were at Medical Transport to conduct the search when Defendant and his partner arrived in one of Medical Transport's ambulances and parked near the entrance to the business. The detectives introduced themselves to Defendant and his partner, and asked if they had laptops in the ambulance. Defendant responded, "Yes," and Detective Rudman asked, "Can you get those for us?"[4] Defendant retrieved his computer from the ambulance and delivered it to Rudman. At this time, the officers had not informed Defendant that they were at the business pursuant to a warrant.

Detectives Rudman and Lucas interviewed Defendant and told him that they were there to ask him questions about child pornography. Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Defendant was advised of his rights, including the right to remain silent. He was told that he was not under arrest, that he was free to leave, and that he could stop the interview at any time. The interview proceeded, and Detective Rudman showed Defendant documents from the investigation indicating that files containing child pornography had been downloaded at Medical Transport's IP address. Defendant admitted that the laptop that he had given the officers was the computer with the child pornography on it. He further admitted to viewing child pornography on and off for a period of a "couple years," viewing and deleting the material, and using search terms associated with

---

[4] This exchange was recorded. *See* note 5, *infra*. The encounter was not coercive and, in fact, Defendant consented to providing the computer to the investigators when they asked him if he would retrieve it from the ambulance.

child pornography.

The recording and transcript of the interview disclose the following exchanges relevant to Defendant's § 2255 motion (emphasis added):[5]

> RUDMAN: *We're going to have to send the computer off.* Okay. We're going to look at it and we're going to compile everything that you have and we're going to have the Commonwealth Attorney look at it. We're going to send the images that we find to the National Center for Exploited Children. They are going to tell us which ones are known children. And what I mean, known children is that's Isabel such and such or that is Jane Doe. And when we get that report back then the Commonwealth is going to look at it, look at what your statement was to us and they are going to say well is this something that we want to pursue.

* * *

> RUDMAN: Did you say that you saw, you know that, we know that you've seen, what, 34 different videos or 34 different files, most were videos. I could say to them that you're at this point after our investigation that you're not, you haven't touched any children. It's only been going on for a few months. It's a curiosity thing, not all the way into, you know, in the long end, we're not looking at a surprise when we're, when we're looking in your computer.

> LUCAS: When they do the computer, if they get on there and find that there's chats going on and you've actually been chatting to people who say they're teenage girls who may or may not be undercover law enforcement officers, or, then, then it completely changes because he's like, I have him an opportunity to tell me all his shit, put all his dirt out there so that we knew where we were at and he didn't take that opportunity, you understand what I'm saying.

> RUDMAN: Or that this thing has been doing on for a lot longer than a couple months, you know, then, because we're going to be able to pull up your search terms and everything. And that's why when we asked you what kind of search terms you're doing, we don't, we don't want to, I don't want to have to go say this is what we found but he was searching 9yo, or 6yo or 3yo, dad and daughter or whatever it was and he only admitted to this.

---

[5] These exchanges include discussions relevant to the claim (raised in Defendant's reply to the Government's motion) that, during the interview, he requested the return of his property. The recording of the interview was played in court during the trial, and the transcript was provided. Upon consideration of the instant motions, I have again reviewed the transcript and listened to the recording of the interview.

* * *

[Defendant]:  I have no problems, you know, telling you whatever and being honest. I need to know, you know, what's going to fall in line with me.

RUDMAN:  Well see, I don't, I don't, one thing that I, I'm in sort of, if you want to say, I don't have all the information unless you tell us exactly everything, I can give you a guideline maybe just from past experience.

LUCAS:  He just can't tell, I mean, as far as what you're going for today, unless you tell us there is a body buried in your backyard, you're walking out of here.

* * *

LUCAS:  Until he compiles all of this information.

* * *

LUCAS:  The Commonwealth Attorney, just based on these 34 without even a preview of the computer they could say, we're charging him with 34 felonies.

* * *

LUCAS:  And that's what they could do.  And that's what decision has to be made once all the information is compiled, but you can't compile that before.

* * *

RUDMAN:  The other things is, – the other thing is we know that your crew was the only ones working on those dates and time.  We also know that you weren't on any calls during those dates and times.

LUCAS:  He already built a case before he got here.

* * *

LUCAS:  And that's why he can't tell you because he hasn't taken your statement and what's on that computer back to the Commonwealth Attorney.  The Commonwealth Attorney knows there's 34 videos, at least, that we know of.

* * *

LUCAS:  Now generally what they do, generally you don't see them charged for each

video. But everything is a different situation. They could very well, anytime that a crime is committed, anytime a crime has occurred they can charge every single part of it.

* * *

RUDMAN: One of the things is, you know, believe it or not we're not here to ruin your life. We're here to, number one, if there is a problem, get you help for the problem. And, number two, to make sure there isn't a problem. So, and once we compile all of that, you know, then I will have, I will have a better, you got a cell phone with you?

[Defendant]: Yes.

RUDMAN: Is it a camera phone?

[Defendant]: Yes.

RUDMAN: Okay. We're going to have to take that, too.

[Defendant]: My cell phone?

RUDMAN: Yes.

LUCAS: Do you have any images on there?

[Defendant]: There's not, I mean, me and my wife.

LUCAS: I'm just saying, not like, none with any kids?

[Defendant]: No.

RUDMAN: The good thing about that is we have somebody that's in house that I can – as long as it's nothing on the cell phone then I can get it back to you reasonably within probably a few days.

[Defendant]: Okay.

RUDMAN: And you just come down and I'll give it to you and you'll, you will walk right out. I can [tell] you *the examination of the computer is going to be months and months out. You're looking at probably two or three months*. And I'm not, I'm not sure . . .

[Defendant]:  Oh, I know, I just got a lot of files on there.

RUDMAN:  And one of the things . . .

[Defendant]:  Not those types of files.

RUDMAN:  No, no, and *one of the things that we can do is if and when the examiner gets to that point you can give me a list of what you want and I will do my best to get it.*  And it's not saying it's going to get it in a week, it's not saying it's going to get it in two.  *I might get it in six.*  It depends on, because you figure there's only probably, maybe, we only use like three examiners and they examine stuff throughout the state.  So there's, we juggle it and we'll try to get it back to you as soon as possible.

[Defendant]:  Like I said –

RUDMAN:  And we don't want to take any of your personal files.  I can tell you that. . . .

There is no evidence in the record to suggest that, after the seizure on June 17, 2009, Defendant requested the return of the computer or to receive any files from the computer, and Defendant does not claim that he made any such request after that date.[6]

On September 3, 2009, after finding a forensic examiner who was willing and able to perform an examination on Defendant's computer, Detective Rudman applied for and obtained a search warrant to search the laptop computer and other relevant items.

Special Agent Paul Wolpert, with the U.S. Immigration and Customs Enforcement ("ICE") agency in Norfolk, specializes in investigating child exploitation cases and computer forensics, and he testified as an expert in this case.  Wolpert performed the forensic examination on Defendant's

---

[6] In his reply, Defendant states that, when he "expressed concern about getting back his legitimate personal files," Rudman replied, '*if and when* the examiner gets to that point, you can give me a list and I will do my best to get' them back."  Defendant further characterizes his "concern" with an annotation that he "[c]learly . . . asked for his property back immediately after it was seized on June 17th."  Even accepting Defendant's characterization of his exchange with Rudman as an immediate request for his computer to be returned to him, Defendant does not claim that he ever made any further requests for the return of the computer.

laptop and external hard drive. On the internal hard drive of the laptop computer, he found 289 images of child pornography, most of which had been deleted, and all of which had names indicative of child pornography. Wolpert found four child pornography videos on the laptop, three of which were active files. He also located evidence that numerous peer-to-peer file sharing programs were on Defendant's laptop computer or had previously been on Defendant's laptop computer. Wolpert recovered a list of search terms associated with child pornography that were used on a peer-to-peer program that Defendant had installed in May 2009. Additionally, Wolpert testified regarding other evidence recovered during his forensic analysis, including relevant Internet history data and the installation of software named "Evidence Eliminator" and "Hide IP."

*B*.

The record developed at trial has been further developed for the purposes of the parties' motions. Most significantly, Detective Rudman has provided an affidavit that has been submitted as an exhibit in support of the Government's motion to dismiss.[7]

The affidavit maintains that Rudman, a member of the CPD "for approximately 13 years," has "investigated numerous crimes involving computers, including child pornography crimes committed by use of the Internet." Rudman explains that he was the "case agent in the above-captioned case," that he "served as the affiant for a search warrant at the defendant's place of business," and that he "was part of the team conducting a search undertaken pursuant to that warrant on June 17, 2009." Rudman's affidavit states that, in the team's "initial encounter with the

---

[7] In support of his reply to the Government's motion, Defendant submitted a number of exhibits that document the initial search of Defendant's workplace and the seizure and subsequent searches of Defendant's cell phone and computer equipment. Defendant's exhibits also include the following: applications for other warrants Rudman sought between May and September of 2009; a letter, dated June 6, 2011, to Defendant from Vaughan Jones; and a partial transcript of oral argument in Defendant's appeal to the Fourth Circuit.

defendant, in the parking lot of the business," Rudman "asked the defendant and his partner whether they had laptops in the ambulance in which they had arrived. When the defendant indicated that he did, I asked 'Can you get those for us?' whereupon, the defendant retrieved his laptop computer and handed it to Detective Michael Flaherty, CPD." Thereafter, "[t]he defendant consented to an interview during which, among other things, he admitted using the computer he just provided to us to search for and look at child pornography."

> Rudman's affidavit explains that,

> [a]t the time of this investigation, CPD did not have a computer examiner or a steady agency that CPD used to send computers for forensic examinations. CPD's practice at that time was to locate an examiner (at another law enforcement agency) and to swear out a warrant to search a computer when such an examiner was able to conduct an examination, and to put the name of the examiner to conduct the examination into the search warrant.

Rudman maintains that he "originally contacted Fairfax Police Department (FPD) which was then doing an examination for [Rudman] in an unrelated case." Rudman does "not recall the precise date," but states that he "would have done this within a week." He notes that, although the CPD did not have a computer examiner, the CPD had a forensic examiner for cell phones at that time and, "[g]iven that the search warrant for the cell phone was sworn on June 23, 2009, it is clear that I was actively working on this case during that time period." "At the end of July," Rudman states, "FPD indicated that they would conduct a forensic examination on the defendant's computer when they were done working on my other case." He notes that he prepared a "police report" "on or about June 23, 2009," which

> includes the following sentence: "I am currently waiting to hear back from Fairfax City Police Department to see if they would do the computer forensics on Daniel Brown computer and other items." Another report that I prepared on or aobut [*sic*] June 30, 2009, includes the statement: "I talked with Fairfax City regarding doing the

examination of the computer in this case. Fairfax City agreed to do the examination and I will take the computer to Fairfax in the next few weeks when I pick up another case."

Rudman states that he

attended the annual national Crimes Against Children conference in Dallas, that was held August 17-20, 2009. FPD was still not ready to perform a forensic examination in this case. At the conference, I met Special Agent Paul Wolpert, a forensic examiner with the Bureau of Immigration and Customs Enforcement (ICE) in Norfolk, Virginia. He told me that he would do the examination for me[.]

Upon his return "home to Charlottesville," Rudman states that he "spoke with Special Agent Wolpert," and the two of them agreed that Rudman "would drop off the computer on September 3, 2009."[8] According to Rudman, he "swore out a search warrant to search the computer equipment on September 3, 2009," and "drove the computer to Norfolk for the examination." Although Rudman states that the warrant "contained the name of the ICE examiner," Defendant points out that it did not; rather, the warrant indicated only the agency that would execute the warrant, in keeping with Rudman's customary practice.[9]

---

[8] Rudman notes that he had prepared a report, dated August 14, 2009, which "states that we sent the computer to ICE in Norfolk 'because Fairfax City was backed up with computer exams.'" He further notes that "[t]he report date is obviously wrong and has a typo regarding the date because I did not know Special Agent Wolpert on August 14, 2009," as Rudman did not meet Wolpert before the conference, which began on August 17, 2009.

[9] Defendant has submitted exhibits in support of his assertion that all of the warrants for which Rudman applied between May and September of 2009 indicated only the agency that would execute the warrant. As the Government points out, "this is a distinction without a difference." Under Virginia law, "[e]very search warrant shall be directed to" any local law-enforcement officer "of the county, city or town in which the place to be searched is located," or any state law-enforcement officer or agent "vested with the powers of sheriffs and police," or "jointly to any such" state or local law-enforcement officer or agent "and to an agent, special agent or officer of" certain enumerated federal agencies, including the Department of Homeland Security. Va. Code 19.2-56. And, as Defendant notes, the warrant need not identify the individual officer, agent, or agency that will ultimately execute that warrant. *See id*. ("Any such warrant as provided in this section shall be executed by the policeman or other law-enforcement officer or agent into whose hands it shall come or be delivered.").

Defendant does not assert that the warrant, once issued, was not properly executed, but he does state that, although the computer was delivered to Wolpert on September 3, 2009, and Wolpert copied the laptop's internal

(continued...)

Rudman concludes his affidavit with the statement that, "[between June 30, 2009, and September 2009," he "spoke with the defendant by phone on approximately two occasions," but Defendant did not ask for the return of his computer.

### III.

### *A.*

Questions of ineffective assistance of counsel are decided under the approach detailed by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984). That approach, which is commonly referred to as the "two-prong approach," *see*, *e.g.*, *U.S. v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010), is outlined as follows in *Strickland*, 466 U.S. at 687:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

The defendant bears the burden of proof to make "both showings"; otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

Regarding the standard of counsel's performance, the defendant must show that counsel's

---

[9](...continued)
hard drive on September 11, 2009, the warrant was not "actually" executed until October 6, 2009, when Wolpert "examine[d] the laptop's internal hard drive and the external hard drive." Defendant states that "[t]he September 3rd search warrant expire[d]" on September 18, 2009, and he points out that Va. Code § 19.2-56 provides that "[a]ny search warrant not executed within 15 days after issuance thereof shall be returned to, and voided by, the officer who issued such search warrant."

representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id*. at 688. Courts should be deferential in this inquiry, guided by "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the constitution." *Id*. at 692. The test for prejudice requires that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In turn, a reasonable probability is described as "a probability sufficient to undermine confidence in the outcome." *Id*. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury," and a defendant must demonstrate that, but for counsel's errors, "the decision reached would reasonably likely have been different . . . ." *Id*. at 695.

*B.*

Defendant has failed to show that his counsel's performance was deficient because, under the totality of the circumstances, the 78-day delay was not unreasonable, and counsel was not ineffective for failing to move to suppress on that basis.[10] As I have already observed, there is a "strong presumption" that counsel's performance "falls within the wide range of reasonable

---

[10] To the best of my knowledge, the reasonableness of a delay between a lawful seizure and obtaining a search warrant has not been addressed by the Fourth Circuit in a case that would be relevant to this one. *U.S. v. Carter*, 139 F.3d 424 (4th Cir. 1998), affirmed the denial of a motion to suppress based upon the retention of property for less than 24 hours, but that case is distinguishable because the property was seized incident to a lawful arrest. *Id*. at 426. *U.S. v. Gastiaburo*, 16 F.3d 582 (4th Cir. 1994), addressed a delay of 38 days between the seizure of a car and a *warrantless* search, which was found to fall "squarely within the specifically established and well-delineated 'automobile exception' to the Fourth Amendment's warrant requirement." *Id*. at 587 (moreover, the search of the impounded vehicle was conducted "on the very same day that [the police officer] first had probable cause to believe contraband could be found behind the dashboard").

professional assistance." *Id*. at 689. Indeed, "effective representation is not the same as errorless representation. An attorney may make a decision or give advice which in hindsight proves wrong." *Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977). In most cases, an ineffective assistance of counsel claim requires a petitioner to "establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation." *Id*.[11]

As I have already observed, the Fourth Circuit found that exigent circumstances justified the warrantless seizure of Defendant's laptop because the detectives had probable cause to believe that it "contained evidence of child pornography." *U.S. v. Brown*, 701 F.3d at 127. To be sure, "a seizure reasonable at its inception because based on probable cause may become unreasonable as a result of its duration," *Segura v. United States*, 468 U.S. 796, 812 (1984), but there is "no bright line past which a delay becomes unreasonable," *U.S. v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012). The Supreme Court of the United States has instructed that courts must assess the reasonableness of a seizure by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983); *see also Illinois v. McArthur*, 531 U.S. 326, 331 (2001) (courts are to "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable").

"On the individual person's side of this balance, the critical question relates to any possessory

---

[11] "Sometimes," however, "the denial of effective assistance of counsel does not result from neglect, ignorance, or any other fault of defense counsel. For example, a trial court may deprive an accused of effective representation by making a tardy appointment of counsel." *Marzullo v. Maryland*, 561 F.2d 540, 544 n. 8 (4th Cir. 1977) (citing *Fields v. Peyton*, 375 F.2d 624 (4th Cir. 1967)).

interest in the seized object, not to privacy or liberty interests." *Burgard*, 675 F.3d 1029. "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura*, 468 U.S. at 806.

> The longer the police take to seek a warrant, the greater the infringement on the person's possessory interest will be, for the obvious reason that a longer seizure is a greater infringement on possession than a shorter one. But unnecessary delays also undermine the criminal justice process in a more general way: they prevent the judiciary from promptly evaluating and correcting *improper seizures*.

*Burgard*, 675 U.S. at 1033 (emphasis added). Additionally,

> it can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it—perhaps by checking on the status of the seizure or looking for assurances that the item would be returned. If so, this would be some evidence (helpful, though not essential) that the seizure in fact affected her possessory interests.

*Id*. (citing *U.S. v. Stabile*, 633 F.3d 219, 235–36 (3d Cir. 2011) (child pornography defendant's failure to seek return of his property for more than 18 months was a factor that reduced the weight the court gave to his interest in the item)).

The state, for its part, "has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion," and Fourth Amendment interests can "tolerate greater delays after probable-cause seizures." *Id*. (comparing *McArthur*, 531 U.S. at 331 (delay after probable-cause seizure of house was reasonable), and *Place*, 462 U.S. at 709 (delay after reasonable-suspicion seizure of suitcase was not reasonable)).

When balancing the individual person's interest against the state's interest, a court must "take into account whether the police diligently pursue[d] their investigation." *Place*, 462 U.S. at 709. "When police act with diligence, courts can have greater confidence that the police interest is legitimate and that the intrusion is no greater than reasonably necessary." *Burgard*, 675 F.3d at 1033

(citing *McArthur*, 531 U.S. at 331 (upholding two-hour delay because it was "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant")). "When police neglect to seek a warrant *without any good explanation for that delay*, it appears that the state is indifferent to searching the item and the intrusion on an individual's possessory interest is less likely to be justifiable." *Id*. at 1033-34 (emphasis added) (comparing *U.S. v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009) (21-day delay was unreasonable where "[t]he only reason Agent West gave for the twenty-one-day delay in applying for a search warrant was that he 'didn't see any urgency'"), with *U.S. v. Vallimont*, 378 Fed. Appx. 972, 976 (11th Cir. 2010) (45-day delay reasonable where officers' attention was diverted to other matters but officers continued to work on the search warrant)).

Defendant hangs his hat on one case from the United States Court of Appeals for the Eleventh Circuit, *U.S. v. Mitchell*, 565 F.3d 1347, where it was found that a twenty-one day delay between a valid warrantless seizure of a computer and the application for a search warrant was unreasonable. That case, however, is distinguishable from this case and, more importantly, it underscores that there is no bright-line rule for unreasonableness, and that a delay is evaluated on a case-by-case basis and in light of all of the facts and circumstances. *See, e.g., Mitchell*, 565 F.3d at 1351, 1352 ("we emphasize again that we are applying a rule of reasonableness that is dependent on all the circumstances") (citation omitted)[12]; *Stabile*, 633 F.3d at 235-36 (same; three-month delay

---

[12] Other cases from the United States Court of Appeals for the Eleventh Circuit, decided after *U.S. v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009), have restated that reasonableness is determined on a case-specific analysis based on the totality of the circumstances, and have upheld delays longer than the 21 days found to be unreasonable in *Mitchell*. *See, e.g., U.S. v. Vallimont*, 378 Fed. Appx. 972 (11th Cir. 2010) (unpublished) (45-day delay reasonable where officers' attention was diverted to other matters but officers continued to work on the search warrant); *U.S. v. Laist*, 702 F.3d 608 (11th Cir. 2012) (25-day delay reasonable).

found reasonable); *Burgard*, 675 F.3d at 1033-34 (six-day delay not unreasonable, and citing cases with longer delays); *U.S. v. Camp*, 2012 WL 148690 at *2 (E.D. N.C. 2012) (citing *Mitchell*, 565 F.3d at 1351, and finding that, considering "all of the facts and circumstances surrounding the delay," a 19-day delay was justified).

In *Mitchell*, the Eleventh Circuit observed that the federal case agent's asserted reason for the delay was that he "didn't see any urgency of the fact that there needed to be a search warrant during the two weeks that he was gone." 565 F.3d at 1351 (internal quotations and brackets omitted). Further noted was the absence of evidence as to why another agent in the nationwide investigation that included that defendant could not have been assigned the task of conducting the forensic examination. "[I]f the assistance of another law enforcement officer had been sought, we would have been sympathetic to an argument that some delay in obtaining that assistance was reasonable." *Id.* at 1352-53. The contrast between *Mitchell* and the instant case is sharp: the investigation of Daniel J. Brown involved the work of a local detective working for a municipal police department that lacked its own computer forensics resources.

*Stabile* involved a child pornography defendant whose computers were seized without a warrant; because the lead agent was assigned "to a Secret Service detail protecting the President and other high officials," three months elapsed before a search warrant was obtained. 633 F.3d at 236. The United States Court of Appeals for the Third Circuit distinguished the facts in *Stabile* from those presented in *Mitchell* (distinctions based, in part, on Stabile's co-habitant's consent to the search). *Stabile*, 633 F.3d at 230. Other factors were found important, including the defendant's failure to request the return of the property. *Id.* at 235-36. Significantly, the Third Circuit cited *United States v. Johns*, 469 U.S. 478, 487 (1985), for the proposition that a defendant who fails to seek return of

property cannot argue the delay adversely affected Fourth Amendment rights. *Stabile*, 633 F.3d at 236 ("although Stabile claim[ed] he needed a computer for work," his co-habitant "brought a replacement computer to the house one day after Stabile's computers had been seized"); *Johns*, 469 U.S. at 487 (defendants who "never sought return of the property" have thus "not even alleged, much less proved, that the delay in the search . . . adversely affected legitimate interests protected by the Fourth Amendment"); *see also Burgard*, 675 U.S. at 1033 ("it can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it—perhaps by checking on the status of the seizure or looking for assurances that the item would be returned").

In my view, Defendant's failure to follow up on Detective Rudman's offer that he might be able to recover and convey to Defendant legitimate files from the computer – much less to inquire about getting the computer back – shows that his Fourth Amendment possessory interests were not unconstitutionally affected.[13] *See Johns*, 469 U.S. at 487; *Stabile*, 633 F.3d at 236; *Burgard*, 675 U.S. at 1033. To the extent that "unnecessary delays . . . undermine the criminal justice process" when "they prevent the judiciary from promptly evaluating and correcting *improper seizures*," *Burgard*, 675 U.S. at 1033 (emphasis added), that concern is not present here, as the seizure itself

---

[13] Defendant's reply to the Government's motion acknowledges that he "did not again ask Rudman to return his property on the 'approximately two occasions' they spoke 'between June 30, 2009 and September 2009.'" (Quoting Rudman's affidavit.) I note also that there is no suggestion that Defendant complained to either Ms. Harris or Mr. Jones that he wanted or needed files from the computer or felt that his computer had been held for too long.

Defendant's reply states that the Government's interest justifying the "intrusion" on his possessory interest was "of minimal – if any – 'importance.'" (Citation omitted.) However, the Government has a compelling interest in deterring the sexual exploitation of children, which includes punishing the consumer of images depicting rape and other acts of sexual abuse and exploitation of minors. Child pornography offenses are crimes of violence, and are considered to be very serious. *See New York v. Ferber*, 458 U.S. 747 (1982). The Fourth Circuit has directed that courts are "to give respectful attention to Congress' view that [child pornography crimes] are serious offenses deserving serious sanctions." *U.S. v. Hecht*, 470 F.3d 177, 182 (4th Cir. 2006) (quotation omitted); *see also U.S. v. Morace*, 594 F.3d 340, 347 (4th Cir. 2010) (same). Defendant admitted that he had used the laptop to search for and download child pornography. The very suggestion that the justification is of "minimal – if any – 'importance'" cannot be taken seriously.

was not improper, justified as it was by exigent circumstances and probable cause, *see Brown*, 701 F.3d at 127.[14]

Moreover, the Government's arguments are buttressed by the expanded record submitted by Defendant in support of his reply to the Government's motion. This record includes Detective Rudman's reports documenting the computer's journey in the summer of 2009 from seizure to examination. The reports show that Rudman acted reasonably and diligently, first looking to one agency to perform the analysis, but then finding another when it turned out that "Fairfax was backed up with computer exams." *See, e.g., Place*, 462 U.S. at 709 (when balancing the individual person's interest against the state's interest, a court must "take into account whether the police diligently pursue[d] their investigation"). The reports show that Rudman was not indifferent to searching the laptop, and the reports provide a good explanation for the delay, given that the first agency was "backed up." *See Mitchell*, 565 F.3d at 1352-53 (delay is more reasonable when the assistance of another law enforcement officer is sought). In fact, Rudman anticipatorily explained to Defendant that "the examination of the computer is going to be months and months out." *See, e.g., Burgard*, 675 F.3d at 1033-34 ("When police neglect to seek a warrant *without any good explanation for that delay*, it appears that the state is indifferent to searching the item and the intrusion on an individual's possessory interest is less likely to be justifiable.")

Given the totality of the circumstances, the delay was justifiable. Accordingly, Defendant has not satisfied the first prong under the *Strickland* test, because his trial attorney's failure to move to suppress on the basis of the delay does not constitute ineffective assistance under the facts and

---

[14] *See also* note 4, *supra*.

circumstances present here.[15]  Had Mr. Jones moved to suppress on the basis of the delay, I would have denied the motion.[16]

**IV.**

For the stated reasons, I will deny Defendant's motion, and I will grant the Government's motion.  Furthermore, I will not grant a certificate of appealability, as I find that Defendant has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1).

---

[15] Counsel for the Government meticulously points out that, when the Office of the Federal Public Defender was Defendant's first counsel, it "had this case for longer than Vaughan Jones did," and yet "never pursued this allegedly obvious ground for suppression."  The Government also describes the Federal Public Defender as having "represented Brown for more than four months prior to the appointment of Brown's trial counsel."  To be sure, the Office of the Public Defender was appointed to represent Defendant on June 29, 2010, and Vaughan Jones was substituted as Defendant's attorney on November 2, 2010.  Thus, the Office of the Public Defender represented Defendant for 126 days before Mr. Jones was substituted.  The guilty verdict was rendered on March 2, 2011.  Therefore, Mr. Jones's representation of Defendant through the trial was a period of 120 days, *i.e.*, Defendant's first trial counsel handled the case for 6 days more than Mr. Jones.  Regardless of the duration of any attorney's representation, counsel for the Government has acknowledged that, prior to trial, while Defendant was represented by the Office of the Public Defender, the parties engaged in "negotiations" that "didn't come to fruition."  Otherwise, there is no record that indicates any strategy or absence of strategy on the part of Defendant's first trial counsel.  Whether the Office of the Public Defender did or did not pursue "this allegedly obvious ground for suppression" is not a question that can be answered by the record in this case.

[16] I note that the Government had a strong case against Defendant on the basis of other evidence.  As Detective Lucas stated during the interview with Defendant on June 17, 2009, Rudman had "already built a case before he got [t]here."  Although the evidence recovered from the computer is extremely compelling, the testimony from Wolpert was fairly dry and technical, and it supported the other evidence of Defendant's guilt.  That evidence included Rudman's initial investigation into historical data concerning apparent child pornography files linked to Defendant's IP address.  Those files had graphic names and distinct Secured Hash Algorithm values ("SHA values," or "hash values"), which Detective Rudman recognized.  The dates and times associated with the files were set forth in the Internet Crimes Against Children Report ("ICAC Report") and showed when the relevant IP address was a download candidate.  Dates and times of the downloads matched up with times when Defendant was working at the ambulance company.  Defendant's work-partner testified at trial that, on a regular basis, Defendant retreated with his computer into the bedroom he used at the business and shut his door.  And, most significantly, Defendant offered Rudman and Lucas a very convincing confession, which was recorded, admitting to using the seized computer to search for child pornography, and admitting to downloading and deleting images and videos of child pornography over a significant period of time.

The Clerk of the Court is directed to send certified copies of this memorandum opinion and the accompanying order to Defendant and to all counsel of record.

Entered this _____30th_____ day of December, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE